And we'll move on to In Re Zohar Corp. Mr. Shapiro, whenever you're ready. Good morning, may it please the court. My name is Akiva Shapiro, Gibson Dun & Crutcher in New York, representing Appellant Patriarch Partners Management Group, or PPMG. With the court's permission, I'd like to reserve three minutes for rebuttal. Granted. The Bankruptcy Court made two fundamental errors here. The reversal of either will result in the payment of the transaction fee due PPMG for the years of work it did providing management services for Oasis, formerly one of Appellee Zohar Fund's portfolio companies. First, the Bankruptcy Court erred as a matter of New York contract law in addressing what all parties agree was a scrivener's error in an agreement between PPMG and Oasis by replacing the phrase change of control with an entirely different defined term, liquidity event, instead of reading it in a far more natural and common sense way that of was intended to be in another two-letter preposition, such as the disputed term read change in control. Well, it may be more natural and common sense in that it sounds more similar, but how does it make sense within the scheme of the documents? What does indemnification have to do with whether it's profitable or not? Sure. So indemnification provisions in Annex A explicitly bring in the definition of the liquidity event and the question of Section 3 because change in control in Annex A is a fork in the road in terms of indemnification. If there has not been a change in control, then the current board makes a determination about whether there's been a bad faith and indemnification covers the employee or not. If there has been a change in control, then that employee can select their own independent counsel to make that determination. And why the parties did that, you know, I have theories about that, but the critical point is that there certainly is nothing inconsistent with looking at Annex A and tying the two of them together as Ms. Tilton testified they were meant to be done, because Annex A already brings in liquidity event. Metaphysics is not really my strong suit, but explain to me the difference between change in control and change of control. So certainly, first of all, there is no difference, meaning a change of control means control has changed and a change in control means control has changed. And that's why we think it made very the common sense answer is that this was a typo. Nobody would have noticed one or the other. As it happens in this contract, change in control is a defined term that relates to which path you go down during indemnification. And our view is that when the proviso said in order for there to be a qualifying change in control, the price, purchase price has to exceed the debt, that's what it was referring to. The Zobar funds say that in order for there to be a qualifying liquidity event that has to have that limitation, the purchase price exceeded the debt. And I say that as a matter of New York contract law, you can't just take your red pen out as a court, as the bankruptcy court did, cross out change of control and write in its pace liquidity. I mean, the issue is this. I think everyone thinks that the change of control is the wrong term. Like everyone thinks that's the wrong term. And so the red pen's coming out. Right. The red pen's coming out. And what you seem to say is take the red pen out and only do of to in. Well, and I think what you're probably saying is, yeah, there was a mistake here. We've got a term that was mistakenly used. We have to look at the overall meaning of this contract, giving maybe less weight to what's in the annex that deals with indemnification, not necessarily a transaction fee, which is what this dispute is about. And when we look at kind of the overall thrust of this, very much as the bankruptcy judge said, we think that that error, the red pen, should write in liquidity of it. It's more letters. Yes. And that's very important because this court and a court in rewriting a contract should do as little violence as possible to the words that the parties use. And it should use its common sense. That's the Homework Residential, as you know, like it says, and lots of New York cases say that, to look at what the parties likely intended. As far as common sense goes, though, there's no common sense problem with reading if the red pen wrote liquidity of it for change of control. It doesn't collapse everything, does it? The common sense that I need is as human beings understanding that a drafter of a contract would more likely make that mistake. I'm standing up here now, and I'm worried that I'm going to say the wrong of or in because it's easy to make that mistake and interchange it. That's what I mean by common sense. But I guess what I'm saying, though, is if this were a typo, and we're looking at the two alternatives, doesn't liquidity event kind of work better? No, Your Honor. It does not work better. In fact, it works worse. The reason it works worse is the exact language that the bankruptcy court erroneously thought was helpful to the funds, which is the in-each-case language. So the way it works is there's three kinds of liquidity events. There's an asset sale, 80 percent or more. The assets are sold. There's an equity transfer, more than 50 percent of the equity, or a merger, more than 50 percent of the merger. Within asset sale, in the plain language of the contract, it says without regard to liabilities. So the reading that the funds have, that asset sale is without regard to liabilities, but yet it only applies where the purchase price exceeds the liabilities. The debt is internally in conflict and in contradiction, and that can't be the correct reading. Our reading fits much better because Annex A in change and control actually carves out X, asset sale, explicitly. So you have in Annex A only Y and Z are change and control, and then the proviso does that. So you've packed a lot into that response. If you don't mind, let me just trace back. What you're saying is that there's three categories, X, Y, and Z. X says without regard for liabilities, but it's carved out in the annex. The annex applies only to Y and Z. And so what you're saying is because without regard to liabilities might be a problem, it's not a problem because it's carved out. Right. It's not a problem to us because if that referred to change and control, then that's only Y and Z. And Y and Z are you do look at whether the purchase price exceeded the debt, and that's fine. You separate out X, which is without regard to liabilities. Without regard to liabilities is describing the sale within a sale period of 80 percent or more. It's telling you how to evaluate the 80 percent that would be part of the sale. 100 percent. Correct. So the ultimate sale, why isn't it perfectly logical that the ultimate sale is still qualified as being profitable? Because if you had, let's say, $100 million in assets and $110 million in liabilities, what that's saying is if $80 million of assets are purchased, it qualifies as an asset sale.  But then you would have to say, but if the sale price doesn't exceed the liabilities, which it doesn't, 100 versus 110, it's not a liquidity event under their reading. So either is or isn't. It wouldn't make sense to them to say it's a sale, it's a change in control or a liquidity event without regard to liabilities. Put that aside, and then when you do compare the liabilities to the assets, it ends up being more. Why not? If it's 80 percent that is being sold in terms of the assets and you are evaluating that 80 percent without regard to liabilities, why is that inconsistent with the definition of a category of qualifying liquidity events where you do then take account of whether the profits are ultimately a profitable sale? Yeah, again, there may be circumstances where that doesn't come into play, but in a situation in which the liabilities exceed the value of the company, then what you're saying is to evaluate whether it qualifies as an asset sale, you look at whether it's 80 percent of the value, the assets, not counting the liabilities. Again, it's $100 million, they bought $80 million worth, and then that qualifies as a liquidity event under that definition. But then you look at the proviso and you say, but does that $80 million that they paid exceed the debts? And it doesn't. That is a requirement for PPMG to be paid its fees. I mean, when it says by its terms, in each case, doesn't that tell us plainly that it should be each of the three categories that is subject to that proviso? No, because in each case refers to in each case where there is a sale or a transaction that you have to evaluate. In each case, you have to see whether the purchase price exceeded the liabilities. I would also say that to the extent that the court believes that this is an ambiguous contract, and there is case law with the JS case that we cite from New York Supreme, that when you have a material scrivener's error, that creates an ambiguity such that you have to look at extrinsic evidence. All the extrinsic evidence is in our favor. We have Ms. Tilton who testified unambiguously and in an uncontradicted, unconverted way that change of control was a typo meant to tie together Section 3 with the discussion of identification. Before we get there, I want to make sure that I understand your position because if we're talking about what we're moving around with a red pen, it seems to me, and help me understand if I'm incorrect, that you're essentially taking the proviso from the liquidity event section and you're placing it in the annex. Well, the parties placed it there because the annex itself in Section 9 refers to the definition of liquidity event and says only Y and Z of liquidity event apply. So regardless, there's going to be a proviso that carves out and says in some circumstance, whether it's liquidity event or change of control, you have this requirement and we say, and that's the plain language of the contract, there's no requirement that they had to have put all provisions relating to indemnification in the annex. They already, again, explicitly tied together the annex and the definition of liquidity event. And so they're saying with respect to change of control, liquidity event doesn't have this requirement, but with respect to change of control, this extra requirement applies. If I could for the remaining minute that I have, I do want to talk quickly about the recharacterization, which I think is very important. Even if the court adopts Zohar Fund's interpretation of the contract, we still believe that the bankruptcy court erred and should be reversed because even the funds concede, this is at page 31 of their brief, that the bankruptcy court was foregoing a recharacterization analysis and instead rendered a decision that the tranches were debt using solely contract interpretation principles. That is completely improper under submicron and many of this court's recharacterization cases, the court's supposed to look at what the parties labeled it, but also their actions, course of conduct, and economic reality. And in a related party transaction, as we have here, as this court said in Finhay and in Getman, you actually disregarded the labels and that the Zohar Funds have nothing to say about that. Here we have the economic reality, which is that there's no interest charge, there are no regular payments, there's no meaningful security, distant maturity rate, discretion to enforce. Do you agree here our standard of review is clear error? No, Your Honor, because the bankruptcy court did not conduct any factual findings. It didn't make any findings of fact at all. All it said is, I'm not doing recharacterization explicitly. I'm not doing recharacterization, I'm just interpreting this contract and that's a question of law that this court can look at de novo and it literally is a blank slate because it didn't do that analysis. If there's no further questions, I'll... I have a question about this recharacterization to the extent it involves the equity kicker. As I understand the equity kicker, sometimes you can convert debt to equity. Is that basically... No, the equity kicker as it's defined in the Zohar indentures is normally the Zohars would invest in debt, but they could get equity alongside it. That's what an equity kicker is. It's equity that comes along with a debt investment. So there's no question they invested. There's debt here relating to Oasis and this additional capital contribution is the equity kicker that is equity. But, I mean, I guess the thought is how is it... What is... What equity did they buy? Didn't they already own 100% of the equity? And so it seems strange to say they... It seems strange to say if somebody already owns everything, their investment, like, buys them more. Because they already own everything. And so when we want to characterize that, it strikes me is a strange thing to do to say, surely you didn't... If you own 100% of an entity, it seems strange to pay money to buy more of that entity. I mean, that... I understand the question. It's preferred equity. As Ms. Tilton testified, it comes in seventh after all of the debt, but it does come before common equity and membership interest. So there was some benefit to them. The reality is that the fund's business was to turn companies around. Sometimes they needed more money, and they would put the money in. And the way it's structured is that she only gets paid, they only get paid upon a sale, and that's what equity is. There's no interest. There's no payments along the way. But what did they buy themselves? I'm just trying to find out what they bought themselves. Yeah, they bought themselves preferred equity. But they already owned all of that. They already owned 100% of the record shares, but... If you own 100% of the equity, and you're paying more for something, I'm just at a loss for what else you're buying because equity really depends on what percentage you own. Well, you have... I mean, for debt, you also have to get something for it. The reality is this structure was that they owned 100%, they put more money in, and the question is just did they put more money so that they could get regular interest payments upon some schedule, regardless of the success of the company? And by the way, that's what this court said in Submicron, that it's debt if you only get it when the company succeeds. Sorry, it's equity if you only get it when the company succeeds. It's debt if you get regular interest payments regardless of the success of the company. And that's exactly how this is structured. They get no money along the way. There's no payments for four years. It's the exact same amount owed. There's no interest. At the end of that four-year period, if it's sold, as Ms. Tilton testified, again, the only... And by the way, direct testimony about the intent. Even in Submicron, we're talking about intent inferred from economic reality and all that. We have direct testimony from a participant about what was intended. It was intended as equity. They only get it at the end of the four years if the company's sold and succeeds. That's equity. Well, to ask Judge Phipps' question a little more directly, why does recharacterization inevitably lead to the result you're looking for? Well, in this case, it leads to the result we're looking for because the court said you look at the economic reality, which basically is the various factors I talked about, interest rate, payment along the way, et cetera, and very importantly, whether a third-party lender would lend under these terms. No third-party lender would lend $20 million to get paid no interest for four years and only get repaid when the company is sold and get nothing along the way and no security. So that is what this court said in Geffman, is the definition of equity versus debt. So that's how this is structured. In addition, again, to the fact that along the way, you know, you look at the party's actions. There was no demand for payment. It was removed from the Zohar II Funds Billing Summary. That's JA-651. After the transaction, you see it says Zohar II is owed $14 million. After the transaction, it's owed $1 million. It's taken out of there. It's treated as equity for tax purposes. It was recorded as a capital contribution in their IRS filings, and it was treated as equity in the trustee report. So all of the available evidence is that this was treated as, understood as equity by all participants, and just because there are no voting rights, additional voting rights that come along with it, every single factor and indicia is that this was equity. I mean, the flip side of that is we have one test that says would a third-party lender lend under these circumstances? Yeah, I mean, the converse of that is an interesting thought experiment too. Would a third-party equity buyer buy under these circumstances if that third party already owned 100% of the equity in a corporation? But I think that's, respectfully, that's the wrong question because this is a related party transaction, and in a situation like this where you're trying to prop up a company, you do sometimes put money in that a third-party lender wouldn't, but when you do it and you're not getting the terms a third-party lender would, that's called equity. And so it's really, so what you're really saying is it's the relatedness, and so the incentive to invest in equity was, I guess, to help the company survive so their debt-to-equity ratio didn't collapse it or something along those lines? And just for cash flow, they needed money along the way in the hope that you turn it around, it becomes more successful, you sell it, and you get your money back. And if you don't do that, maybe the company crashes and burns and you get nothing. So it's almost like you're throwing more money after something so that you hope that it flies someday instead of sinks. I would say. Okay, all right. I want to go back for a moment just to make sure I'm understanding your reading of Annex A. Sure. So the way this reads, under 2A, if there's an asset sale or there's an equity transfer or merger with a request that the board do the review by a covered person who's seeking indemnification, then the board gets to make that determination. And your reading would have it that the board only makes that determination in terms of indemnification for good-faith litigation if the transaction was profitable in the case of the stock sale and merger. Is that right? It's the opposite. If the stock sale or merger was profitable, then you get to 2B. If a change in control has occurred, then the covered person, and has not requested the standard of conduct determination to be made pursuant to Clause A, then it's made by the independent counsel. And the reason for that, I would submit, although there's no record evidence of this, it's just what we're proposing, is that that is, number one, an incentive for somebody to drive the value up because then if there's an issue here, they get to pick their independent counsel and they don't have the determination made by the board. And it also is a situation where there's a change in control. The words mean something. Where there's been a stock sale or a merger, it's a new board takes over, and so that old person doesn't want these new people they don't even know to make this determination. They get to pick their independent counsel. But if there is an asset sale, there's no change, or it wasn't a profitable transaction. Again, it's sort of a ding on the company for not being profitable. Then the board gets to make the determination. I'm just not understanding why whether the transaction was profitable has any bearing on whether a covered person would be seeking to have the board versus an independent counsel. Well, it's whether they have the right to have the independent counsel make the determination. Meaning they have a right to have their own independent counsel make the determination, which is a good thing. That's something that someone would prefer, and that only occurs where it's essentially a profitable transaction. Okay. Thank you. No further questions? We'll hear from you in rebuttal. Good morning, Your Honors. May it please the Court, Joseph Barry of Yonconawe on behalf of the Appley Zohar III Corp and its affiliated Chapter 11 debtors, who I'll refer to as the Zohar Funds. Your Honor, I'm going to start somewhere where I didn't plan to, which is to address Judge Phipps' question to Mr. Shapiro. To be clear, no money was invested with this tranche. What this was, pursuant to the Eighth Amendment, was commitment fees and other amounts that were already owed by OASIS to the lenders. So this wasn't an investment of capital to shore up the company's finances. What it was was it was existing debt that, through the amendment, the parties agreed to restructure into a new tranche of secured indebtedness on the company, which is why it was put into place in that seventh prepayment preference. And I'll talk about the terms of the amendment in a minute, but something doesn't have a prepayment preference in relation to other existing tranches of debt if it's only debt. I just wanted, Your Honor, to be clear that in the colloquy between you and Mr. Shapiro, it appeared as though it was, the comment was that there was cash invested to shore up the company's finances. That certainly didn't happen here. Instead, it was basically debt forgiveness. It would improve, as he said, maybe cash flow concerns or something else like that. Because it was put in the bottom of the prepayment preference for debt, it was restructured into something that had a maturity date for interest, but it wasn't reconverted into equity. I just didn't want there to be this sense that something was bought and sold. So where I did want to start, which is where I will start, is I thought Mr. Shapiro said something interesting in his remarks, which is, it's the court's job to do as little violence to the words in interpreting the contract. In reality, it's the court's job, I believe, to do as little violence to the contract's meaning. The idea that you have to move around, or in Your Honor's parlance, redline, the fewest words possible, I don't think is what the law is. I think the law requires, Your Honors, to look at the contract as a whole and interpret its meaning in the most reasonable way. So I want to focus a little bit on what Patriarch's argument, if it was accepted by the lower courts, would have required those courts to do. So under Patriarch's reading of the contract, the lower courts would have either had to struggle to explain or disregarded entirely the following terms and phrases in the contract. Quote, for purposes of this Section C, end quote. Quote, for purposes of this Annex A, end quote. The phrase, in each case, in Section 3C, the term qualifying in Section 3C, and the phrase, without regard to liabilities, also is used in Section 3C. So the lower court would also have to have not only accepted evidence, which it did not, because it was not required to do because the contract is unambiguous, but also would have to give Patriarch every benefit of the doubt as to the weight and viability of that evidence. What do I mean? So Patriarch contends that the Amendment 8 tranche of debt is an, quote, unquote, equity kicker. As Patriarch's trial witness testified, and this is at JA 359, the term equity kicker appears nowhere in the relevant credit documents for OASIS, and it's devoid in the record below other than in Patriarch's briefs. Patriarch's argument is that an equity kicker is a form of equity under the Zohar Fund's indentures, which you just heard from Mr. Shapiro. That's the Zohar Fund's indenture with it and its senior secured creditors. They were not admitted to the evidence, and they're not part of the record here, and Patriarch's trial witness testified that OASIS was not a part of that agreement. As I stand here today, Your Honors, I have no idea what an equity kicker is in relation to the Eighth Amendment to OASIS's credit documents. Patriarch also contends that certain trustee reports did not report the Amendment 8 tranche of debt, therefore, they must be equity. You just heard that from Mr. Shapiro as well. No trustee reports were admitted into the record below. They're not a part of the record here. And please bear in mind, Your Honors, that Patriarch doesn't argue that had the trustee reports been admitted, they would have shown that this debt was equity. Their argument is the absence of the Amendment 8 tranche on the trustee reports somehow proves that they were equity with virtually no explanation as to how. You heard this again from Mr. Shapiro. Patriarch contends for tax purposes the Amendment 8 tranche was treated as equity. No tax records were admitted into evidence before the trial court, and Patriarch doesn't really make clear what party allegedly treated the Amendment 8 tranche as equity for tax purposes. Patriarch contends there were certain consequences to Lynn Tilton, the owner of the appellate, if the Amendment 8 tranche of debt were actually considered debt. No evidence was adduced as to what those alleged consequences are. And more importantly, Your Honors, it's totally unclear what relevance any consequences to Lynn Tilton, that Lynn Tilton would bear, has to the court's reading of an interpretation of a contract to which Ms. Tilton isn't a party. Lastly, Your Honor, Patriarch contends that no commercial bank would agree to the terms of those set out in the amendment to the OASIS credit agreement. And again, there's no evidence that was put in the record on this point. It's devoid in the record below. So, in contrast, Your Honors, Zohar funds have asked the lower court, really asked the lower courts, to read the contract in its entirety in the most reasonable way possible. The way that would not create all of the issues and uncertainties that I just described, and conclude that on the whole, the contract is not ambiguous, and that's precisely what the lower court did, and this court should affirm. Patriarch's assertion that the lower court should have considered extrinsic evidence under New York law is incorrect. The Scotto decision, which Patriarch starts for this claim, actually states that extrinsic evidence may be considered only if the agreement is ambiguous, and here, the lower court determined that they were not ambiguous. On this point, Patriarch argues that it was reversible error for the district court to conclude that the contract is ambiguous, but still not allow parole evidence. But the premise of this argument sits on a faulty analysis of what the district court actually did. The district court accepted the party's agreement that change of control in Section 3C, I'm not afraid to say change of control, was a scrivener's error at the end of Section 3C of the agreement, that it created an ambiguity in that phrase, because it's a capitalized term that's not defined and not used elsewhere. The court did not conclude that the entire contract was rendered ambiguous, and therefore parole evidence was necessary. Like Judge Owens in the bankruptcy court, Judge Noriega looked at the other terms in the contract and was able to conclude that the contract as a whole, including the phrase at the end of 3C, was not ambiguous when read along with all of the contract's other terms, this is exactly what the bankruptcy court did, and it's entirely in line with the Scotto decision. Scotto says... Why isn't your colleague's interpretation of 3C in the proviso to mean change in control equally plausible? It's, for all the reasons I mentioned at the beginning, Your Honor... I understand the textual ones about, you know, it's for this section, but in terms of the meaning that it imports here and into Annex A. So, it renders the entire contract, almost unintelligible. If you add in change of control in 2.3.C, it doesn't work with the indemnification provisions of Annex A for the reasons that were described in Mr. Shapiro's presentation, but also including the fact that X isn't included in the definition of change of control on Annex A. In other words, it creates a massive hole, Your Honor, in the contract itself because the change in control in Annex A excludes X. That leaves open the question of, so what happens for indemnification when it's a sale under X in Section 3? Moreover, the agreement itself is only 11 pages long. Three and a half pages of that contract are Section 7, which is titled indemnification. It wouldn't make any sense whatsoever to adopt Patriarch's reading of that contract since it knew where to put provisions relating to indemnification. That would be in Section 7, which, again, is three and a half pages of the 11-page contract. But there's no question, in terms of the change in control and its effect for indemnification, that there is a distinction that's being drawn between the asset sale and the other two categories. Right? That's in the plain text of Annex A. You're running that by me again, Your Honor. I apologize. The reference to X and Y, the cross-reference to liquidity event, is in Annex A. Correct. Correct. But again, that seems to me to leave a gigantic hole in the agreement as to what happens for indemnification relative to X because X isn't picked up in the definition of change in control on Annex A. It's specifically excluded. So, in other words, why would the parties make an annex that outlines what happens, how, and when the determination as to who's a covered person and whether their conduct met the standard of conduct for two of the three enumerated forms of transaction? It doesn't make any sense whatsoever for the parties to have excluded that and yet somehow bring that defined term, change in control, into Section 3C. Well, asset sale is incorporated into 2A, right? An asset sale falls into the category of if a change in control has not occurred. Right, but it's excluded from the definition of change in control, which, again, I think leaves a big hole into what happens when there's a sale of assets for purposes of determining whether the covered person's conduct was entitled to indemnification. Plus, there's an entire section on indemnification in the body of the agreement that's not in Section 3, it's in Section 7. So, I mean, so what you're saying is there would be no possibility for indemnification in Subsection X or in Event X? Is that what you're saying if we go with your adversary's reading? I think that's the hole that's left in the agreement, one of the holes that's left in the agreement if you accept my adversary's reading of the contract. Yes. And so you think that it's better to read this as saying that of course the parties intended indemnification in the X event. I don't know if it's necessarily a subsection, but it's if X occurred, of course they intended indemnification. Yes. And because they intended indemnification, and we have that, and you're pretty confident of that not by looking at Section 3 necessarily or the annex, but by looking elsewhere in the agreement, maybe was it 2 and 7, something like this? That's correct, Your Honor. And again, the placement of a cross-reference to indemnification in Paragraph 3 of this agreement, at least in our view, makes absolutely no sense. Just because they do employ the doctrine of one of these things is not like the other in saying that the court should use change in control in place of change of control, but I think as the case law that both parties cite, it has to make sense in the totality of the contract. So even if one could posit that change in control could be placed in Section 3C2D, and that makes sense for clarifying that phrase. It has to fit with the rest of the agreement, and I think what happens here, and to use Mr. Shapiro's words, that it does grave violence elsewhere in the agreement if you do that, whereas liquidity event, as both the Bankruptcy Court and the District Court found, is there's absolutely no clarifications or confusion or other ambiguities that could get created elsewhere in the document if you replace it with liquidity event. It seems that there's a trade-off, right? There's a trade-off between creating indemnification for Category X or creating a transaction fee in these instances. And so the reading that he's advancing is read it this way so that we can get a transaction fee. That's in his client's interest because they want the transaction fee. But it turns out, though, that the trade-off for that interpretation is indemnification under X. But it doesn't strike me that there's a zero-sum game here where we can both reconcile that there's no trade-off. We have to pick one or the other, right? Well, that's true, but I think the law here is that the court doesn't review the contract and decide in whose parochial interest is sort of more favorable, right? It's that what is the most natural reading of the contract, what makes commercial sense when you review the contract as a whole. And here, as I've said, liquidity event is the most natural fit for what happens elsewhere in the contract if you replace it with change in control. If I could, I'd like to briefly address the Trotch 8 Amendment, if I may. I'm down to my last minute. So Patriarch posits that a transaction fee is due no matter what because, as Mr. Shapiro said, the transaction actually paid off the debt. And again, it relies on this argument that the Trotch 8 Amendment is a quote-unquote equity kicker. If your honors simply look at the document, that simply disproves that theory. Among other objective indicia of the intent to create debt is that it's actually called debt. For example, the Trotches are TLD, TLE, those are the three Trotches that were put in place with this amendment. And Patriarch's trial witness testified that that means term loan. The amendment refers to the debt as loans. It refers to Zohar funds as lenders. It has a maturity date. It refers to Oasis as the borrower. And it also refers to the funds not being reborrowed. Again, to the original point that I made, Your Honor, there was no cash coming in, so you don't reborrow equity. So I see I'm out of time, unless Your Honors have any more questions, I would cede the podium to Mr. Shapiro. Okay, thank you. All right, thank you. Thank you. Briefly, I'd like to address a few of the points raised by Mr. Barry in his presentation. Number one, the idea that our reading would read out the various terms in the contract. I won't go through the discussions that we had already, but to take one example, the bankruptcy court focused on qualifying. It's just not true. Ours is a qualifying change in control. It limits what change in control is. Theirs is a qualifying liquidity event. Qualifying works either way, and it's true for the rest of the terms that they focus on. What they don't address, and they don't grapple with, in my view, is the fact that under New York law, you can't have different terms. When different terms are used in the contract, they mean different things. If they meant liquidity event, they used it five, eight, ten times in the previous paragraph, they would have said liquidity event. It's not like there's a blank here, and the court's being asked to fill in the blank. Words are used. They're real words. It says change of control. So we're not supposed to figure out, oh, whoa, would it fit better, liquidity event? Would it fit better, change of control? Change in control? The words are there, and so we have to do, again, as little violence as possible. But don't you do that as soon as you acknowledge that there's a scripture's error? Then it's... No, because... We don't go for, you know, which one sounds most alike. It's not sounds most alike, but ours is a typo. Mr. Barry, even though he said he was not worried about mixing them up, he did, and I'm not saying that to, you know... The point is, and I'm sure I mixed it up, too. The point is, that's a typo. In and of. They mean the same thing. Control has changed. That's a typo. Versus a rewriting. I think they're very different things. Yes, it's a typo. We acknowledge that. We have to figure out what it means. But, you know, it's an Occam's razor kind of thing. You know, the simplest explanation is the one that probably is true, and we can all just take it, I think, respectfully, kind of put our, like, human hats on, and much more readily understand that a typo was made, and someone meant to write change in control, they wrote change of control, then to say, well, the drafter, you know, there's a blank here, and we've got to fill it in, and we're going to fill it in with liquidity. C2D, couldn't it just as easily be called change of control as liquidity event? I mean, it's describing three different types of sales that could be... It's labeled liquidity event, but couldn't that just as easily be... have a header of change of control? I mean, no, because that change in control... I mean, this is why that carving out asset sales is actually really helpful to us, because you have a change in control when you have a stock sale or you have a merger. That's a change in control. But to carve out asset sales, that is a liquidity event. It's putting money into the company, but you can keep the same board, and so it's not a change in control. So the fact that X is carved out... And by the way, it's not that indemnification doesn't apply. It just means that the board makes that determination about the conduct versus being able to appoint an independent director. The fact that asset sales carved out, it works perfectly with the difference between what a liquidity event is, money is put into a company, that includes an asset sale, and what change in control would mean, which is not necessarily the case when there's an asset sale. But you may end up with different people controlling the board as a result, right? You may, but in the other circumstances, you almost necessarily will. So I think it's a better fit for us. With 80% asset sale? Well, but there's the 20% left, and that company still continues. It's a going concern. You're just selling the assets. So that company remains. Whatever assets it has, it has. So there isn't necessarily a change in control the same way. But back to the indemnification. I asked your adversary about, isn't there just this necessary trade-off? And I guess the thinking is there is a trade-off. I think you'd agree it's necessary, but you might not agree with what that trade-off is. It's not that there's a loss of the ability to receive indemnification. It's the loss of the ability to elect who may make that indemnification decision. And the loss of that ability, the election, doesn't necessarily frustrate the entire purposes of the contract because it's not always necessary, as I understand it, to even make that election as part of such a contract. It might be nice. It might be advantageous. It might be well worth the negotiation, but it's not necessary. So have I characterized what you would say in response to that correctly or not? Yes, you have. Okay. If I could just sum up in 30 seconds. We've talked a lot about the plain meaning of the contract. Obviously, we believe our interpretation is the correct one and that, therefore, a transaction fee should be owed on the plain meaning of the contract. Even if you don't accept that, you should at least accept that it's ambiguous. There's only testimony in one direction. It's in our favor. And even if you don't accept that, this should be characterized as equity for all the reasons that I laid out in the long colloquy that we had. I would just point out that my adversary didn't address any of the Third Circuit law and any of the Third Circuit standards for recharacterization. Once again, ignoring Geffman and Finhay, that in related party transactions, the labels don't matter. Once again, ignoring that here the economic realities are that this is equity and not debt. And I would say the fact that... Excuse me. On that point, and I know you're wrapping up, but I just have one last question for you. Sure. And that is that your two arguments are independent. Yes, they are. We could entirely reject your proposition that this is equity, not debt. We could think that that's totally wrong, but still decide in your favor if we decided that the Scrivener's error of mint in. That's correct. Our two arguments are completely independent. If you accept either of them, we would win, obviously for different reasons. If you accept the Scrivener's error argument, then you don't need to reach recharacterization. And so just the last thing I would say is, you know, the fact is not correct that these are described as debts in the relevant instruments. They do use words such as loan and borrower, but this court has repeatedly rejected, repeatedly rejected those kind of characterizations of the economic reality, did it in the Machnam and Acham case, in Sensening, in Finhay, in Gaffman. So that really is meaningless here. What you look at is economic reality and the course of conduct that all points in one direction, that this is equity. Okay. Thanks to both counsel. We'll take this case under advisement as well.